

FILED
KENNETH J. MURPHY
CLERK

99 JUN -3 PM 2: 54

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM P. McDANNOLD, et al.,          :

      Plaintiff,          :

      vs.          :

STAR BANK, N.A., et al.,,          :

      Defendants.          :

Case No. C-1-94-002

CHIEF JUDGE WALTER HERBERT RICE

DECISION AND ENTRY APPROVING SETTLEMENT AGREEMENTS
BETWEEN PLAINTIFFS, ON ONE HAND, AND DEFENDANTS
LINDHORST & DREIDAME, WILLIAM KIRKHAM AND GRADISON &
COMPANY, ON THE OTHER; DECISION AND ENTRY SUSTAINING
JOINT MOTION TO APPROVE SETTLEMENTS (DOC. #175); EXPRESS
FINDING OF NO JUST REASON FOR DELAY, PURSUANT TO FED. R.
CIV. P. 54(b); DIRECTIVE TO ENTER FINAL JUDGMENT, APPROVING
SETTLEMENT AGREEMENTS AND DISMISSING, WITH PREJUDICE,
PLAINTIFFS' CLAIMS AGAINST DEFENDANTS LINDHORST &
DREIDAME, WILLIAM KIRKHAM AND GRADISON & COMPANY;
DISTRIBUTION OF SETTLEMENT PROCEEDS STAYED; ALTERNATIVE
CERTIFICATION OF DECISION AS APPEALABLE UNDER 28 U.S.C.
§ 1292(b); ENTRY JOURNALIZING PROCEDURES ESTABLISHED
DURING TELEPHONE CONFERENCE CALL CONDUCTED ON MAY 18,
1999

This litigation arises out of the leveraged buyout of the shares of stock of

Electro-Jet Tool & Manufacturing Company, Inc. ("Electro-Jet").  Since the Court

has previously set forth the facts and circumstances giving rise to this litigation, it

need only recite those circumstances that are essential to an understanding of the

*284*

issues resolved herein.  In 1987, Defendant John Enders ("Enders"), who was then the beneficial owner of approximately 83% of the shares of Electro-Jet's stock, decided to sell his interest in that company.  That decision ultimately led to the transformation of Electro-Jet's then existing profit sharing plan into an employee stock ownership plan ("ESOP"), which would the purchase Enders' stock.  Defendant William Kirkham ("Kirkham") and his law firm, Defendant Lindhorst & Dreidame ("L&D"), were retained to represent the ESOP, and Defendant Gradison & Company ("Gradison") was retained to conduct the required appraisal.[1]  On December 23, 1987, employees of Electro-Jet were informed that the profit sharing plan would be transformed into the ESOP, and that the ESOP would purchase, for the sum of $12,500,000, the 83% of the shares of Electro-Jet which were owned by Enders.  Of that sum, $2,300,000 would come from the assets of the ESOP, and the remainder would be financed by a loan from Defendant Star Bank ("Star").  Electro-Jet, rather than the ESOP, would be responsible for repaying the loan.  The transaction closed on January 29, 1988.  As a result, the ESOP became the owner of approximately 83% of Electro-Jet's shares, and it transferred $2,300,000 of its assets to Enders.

In their Amended Complaint, the Plaintiffs, who are participants in the ESOP, with one of their number the current Trustee of the ESOP (Frank Gollings), set forth claims under the Employee Retirement Income Security Act of 1974

---

[1]Gradison retained Z. Lew Melnyk ("Melnyk") to perform the actual work required to complete the appraisal.  For purposes of convenience, the Court will treat Gradison and Melnyk as one.

("ERISA"), 29 U.S.C. § 1001 et seq., against Star, Enders[2] and others. In addition, the Plaintiffs set forth state law claims against L&D, Kirkham and Gradison.[3] Enders, in turn, has filed a Third-Party Complaint against Thomas Simons ("Simons"), Enders' long-time attorney, and Graydon, Head & Ritchey ("GH&R"), Simons' law firm. See Doc. #.159.

On May 2, 1997, the Plaintiffs, L&D, Kirkham and Gradison ("Proponents") filed a joint motion requesting that the Court approve the settlement agreements into which they had entered. See Doc. #175. The Plaintiffs had agreed to settle their claims against L&D and Kirkham for the payment of $1,000,000, and their claims against Gradison for $750,000. That motion has been opposed by Defendants Enders and Star and Third-Party Defendants Simons and GH&R ("Opponents"). See Doc. #180. Of particular importance, the Opponents objected to the portion of the settlement agreements, which, if approved by the Court, would have prevented them from asserting claims for indemnification or contribution against the settling Defendants (a "bar order"). In addition, the Opponents objected to the type of set-off that they would receive, if this Court were to approve the settlement agreements. Those agreements provide that the amount paid thereunder would reduce the liability of the non-settling Defendants on a pro tanto or dollar-for-dollar basis. The Opponents suggested that their liability should be reduced on a proportionate fault basis (i.e., the non-settling

---

[2]The Plaintiffs have also sued Joyce Richter, in her capacity as trustee of a trust created by Enders. For purposes of convenience, the Court treats Enders and Richter as one.

[3]Plaintiffs initially set forth a claim of breach of fiduciary duty under ERISA against L&D and Kirkham. However, this Court has previously ruled that those Defendants were not fiduciaries under that statute. See Doc. #217.

- 3 -

Defendants would be liable only for their proportionate share of the total loss suffered by the ESOP).[4]

Since the Plaintiffs brought this action as a derivative action, on behalf of themselves and all participants in the ESOP, they sought to have the settlements approved in accordance with Rule 23.1 of the Federal Rules of Civil Procedure. The final sentence of Rule 23.1 provides:

> The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

Procedures applicable to the settlement of a class action under Rule 23(e) of the Federal Rules of Civil Procedure must also be applied when a court is asked to approve the settlement of a derivative action under Rule 23.1.  See 7C Wright, Miller & Kane, Federal Practice and Procedure § 1839.  The first step in the approval process for the settlement of a class action, under Rule 23(e), is for the District Court to give its preliminary approval to same.  Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983).  On March 30, 1998, this Court gave its preliminary approval to the Joint Motion to Approve Settlements (Doc. #175).  See

---

[4]In other words, under a proportionate fault method, the non-settling Defendants would be required to pay only that portion of the total damages, suffered by the ESOP, which corresponded with their proportionate share of the total liability. Thus, in this litigation, if the actions of the settling and non-settling Defendants combined to cause the ESOP to suffer damages in the sum of $5,000,000, and the non-settling Defendants were found to be 50% responsible, they would be liable for only $2,500,000 of those damages, regardless of the amount of the settlements at issue herein, whereas they would be liable for $3,250,000, under a pro tanto approach ($5,000,000 damages less $1,750,000 in settlements), if those settlements are approved.  Of course, by changing the numbers in that hypothetical example, one could conceive of a situation where the pro tanto approach would result in the non-settling Defendants paying less than they would under the proportionate fault method.

- 4 -

Doc. #218. On that date, the Court also entered a Decision, in which it addressed and rejected a number of the objections to the settlement agreements propounded by Enders, Star, Simons and GH&R. See Doc. #217. In particular, the Court rejected the Opponents' objection to the bar order contained in the settlement agreements, since those Defendants did not have rights to indemnification or contribution, under either federal or Ohio law, against any of the Defendants who had settled.[5] The Court did not, however, resolve the question of whether the non-settling Defendants' liability should be reduced on a pro tanto or proportionate share basis. On June 1, 1998, the Court conducted a fairness hearing on the two settlement agreements into which the Plaintiffs had entered.[6] The Court now sets forth its reasons for concluding that those agreements are fair, reasonable and adequate and, therefore, its rationale for approving them.[7] As a means of analysis, the Court initially sets forth its reasons for finding that the settlement agreements are fair, reasonable and adequate to the participants of the ESOP,

---

[5]The bar order would have prevented the non-settling Defendants from asserting "claims over" against the settling Defendants. That term was defined to include any type of claim by which the non-settling Defendants attempted to obtain indemnification and/or contribution from the settling Defendants, based upon the liability of the former to the Plaintiffs. Since the non-settling Defendants did not have rights to indemnification or contribution against the settling Defendants, the Court concluded that it was not necessary to conduct a mini-trial to determine whether the settling Defendants were paying their fair share of the total, potential liability owed to the Plaintiffs.

[6]During that hearing, the Court heard from the Plaintiffs, L&D, Kirkham, and Gradison, as proponents of the settlement agreements, and Star, Simons and GH&H, as opponents of same.

[7]During that fairness hearing, the Plaintiffs set forth the manner in which participants in the ESOP had been notified of the two settlement agreements and of that hearing. The Court found that found that notice had been reasonable and adequate. See Transcript (Doc. #246) at 9.

following which it will turn to its reasoning for concluding that the non-settling Defendants' liability should be reduced on a pro tanto, rather than on a proportionate basis.

In Granada Investments, Inc. v. DWG Corp., 962 F.2d 1203 (6th Cir. 1992), the Sixth Circuit explained the standards which govern the approval or disapproval of a settlement in a derivative action under Rule 23.1:

> We review the approval of settlements in shareholder derivative actions for abuse of discretion. In re General Tire & Rubber Co., 726 F.2d 1075 (6th Cir.), cert. denied, 469 U.S. 858 (1984); Priddy v. Edelman, 883 F.2d 438 (6th Cir. 1989). Settlements are welcome in cases such as this because litigation is "notoriously difficult and unpredictable." Maher v. Zapata Corp., 714 F.2d 436, 455 (5th Cir. 1983) (quoting Schimmel v. Goldman, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)). Absent evidence of fraud or collusion, such settlements are not to be trifled with. Priddy, 883 F.2d at 447.
> Relevant factors framing our inquiry include the likelihood of success on the merits, the risk associated with the expense and complexity of litigation, and the objections raised by class members. See Officers for Justice v. Civil Service Commission of San Francisco, 688 F.2d 615, 625 (9th Cir.), cert. denied, 459 U.S. 1217 (1983). The district court enjoys wide discretion in assessing the weight and applicability of these factors. Maher, 714 F.2d 436 at 455.

Id. at 1205-06. In addition to the factors listed in Granada, the Sixth Circuit has said, in the context of the settlement of a class action under Rule 23(e), that the District Court should consider the amount of discovery conducted and whether the settlement was reached as a result of arms-length negotiations (as opposed to some form of fraud or collusion). Williams, 720 F.2d at 923. The District Court should also give some deference to the judgment of counsel representing the class. Id. at 922-23. The Proponents of the two settlement agreements, Plaintiffs, L&D, Kirkham and Gradison, have the burden of persuading the Court that the settlement agreements are fair, reasonable and adequate. In re General

- 6 -

Tire & Rubber Co., 726 F.2d 1075, 1080 (6th Cir.), cert. denied, 469 U.S. 858
(1984) ("The proponents of the settlement, however, have the burden of
persuading the court that their compromise is fair, reasonable and adequate.").

     The first factor identified by the Sixth Circuit in Granada is the Plaintiffs'
likelihood of success on the merits of their claims against L&D, Kirkham and
Gradison. This factor requires the Court to consider not only the likelihood that
the Plaintiffs would be able to establish that those Defendants are liable, but also
the probable amount in damages that the Plaintiffs would have recovered from
those Defendants had they prevailed. The Court must then weigh those
components against the relief offered by the settlement. Williams, 720 F.2d at
922.

     The Plaintiffs have asserted a legal malpractice claim against L&D and
Kirkham and a claim of fraud against Gradison.[8] Two potentially fatal
impediments to the Plaintiffs' claim against L&D and Kirkham were identified
during the fairness hearing. A major obstacle to the Plaintiffs' claim against L&D
and Kirkham would have been their statute of limitations defense. This litigation
was filed approximately six years after Kirkham provided the services which

_____

[8]The appraisal by Gradison was completed in January, 1988, nearly six years
before the Plaintiffs initiated this litigation. The statute of limitations for a claim
of malpractice against Gradison would have been set forth in § 2305.09 of the
Ohio Revised Code, which provides that such a claim must be brought within four
years. The discovery rule is not applicable to claims of professional malpractice
that are governed by § 2305.09. Investors REIT One v. Jacobs, 46 Ohio St.3d
176, 546 N.E.2d 206 (1989); Hater v. Gradison & Company, 101 Ohio App.3d
99, 655 N.E.2d 189 (1995). Therefore, any malpractice claim against Gradison
by the Plaintiffs would have been barred by the statute of limitations.
Consequently, the Plaintiffs asserted a claim of fraud, rather than one of
malpractice or negligence, against that Defendant.

underlay the Plaintiffs' claim against him and his law firm. The statute of limitations for legal malpractice claims in Ohio is one year. See Ohio Rev. Code § 2305.11. Although the discovery rule applies to legal malpractice claims (see Zimmie v. Calfee, Halter & Griswold, 43 Ohio St.3d 54, 538 N.E.2d 398 (1989)), it is certainly possible that the jury would have found that the Plaintiffs knew or should have known of the alleged negligence by Kirkham, more than one year before this litigation was filed. Assuming that the jury would find that the Plaintiffs' claim against L&D and Kirkham was not barred by the statute of limitations, the Plaintiffs would still face the hurdle of convincing the jury that Kirkham had committed malpractice. According to Plaintiffs' counsel, his clients had retained a eminently qualified expert witness, who would testify that Kirkham's performance fell below the requisite standard of care; however, Plaintiffs' counsel also conceded that L&D and Kirkham had retained an equally distinguished expert witness, who, not surprisingly, would provide diametrically opposite testimony. With respect the Gradison, the Plaintiffs' burden, if their claim against that Defendant were to be tried, would be to convince the jury not that the appraisal had been conducted negligently, but rather that Gradison had intentionally misrepresented the results of that appraisal. As Plaintiffs' counsel conceded, it might be difficult to convince a jury that Gradison had so acted, since it was merely an appraiser which had absolutely no motive to defraud anyone. See Transcript (Doc. #246) at 20. Based upon the foregoing, the Court finds that the impediments to Plaintiffs' claims against L&D, Kirkham and Gradison, although not establishing that those claims would have necessarily

failed, certainly cast doubt on the question of whether the Plaintiffs would have succeeded in establishing that the settling Defendants were liable.

The question of the amount of damages the Plaintiffs might have been able to recover, had they been able to prevail on the merits of their claims against the settling Defendants, causes the Court to confront the major objection to the settlement agreements posed by the Opponents, particularly Star, Simons and GH&R, at the fairness hearing. During that hearing, Plaintiffs' counsel explained his theory of recovery against L&D, Kirkham and Gradison as being based upon the premise that their misconduct had caused the ESOP to enter into the transaction with Enders. As a result, the ESOP lost $2,300,000 of its assets and the opportunity to grow those assets in the ensuing years. Plaintiffs' counsel estimated that damages would be in the range of between $5,000,000 and $7,000,000.[9] Although not questioning that range,[10] the Opponents asserted that the Plaintiffs were claiming that the ESOP suffered a different loss, as a result of the actions of L&D, Kirkham and Gradison, than it had suffered as a result of their (the Opponents') actions. In support of that assertion, Star's counsel furnished a copy of a summary of damages, which the Plaintiffs had previously provided to the Defendants for purposes of mediation. In that document, the Plaintiffs set

---

[9]With respect to Gradison, Plaintiffs counsel explained that there was an alternative theory, under which that Defendant could be liable only for the difference of the value of the stock of Electro-Jet, as represented by Gradison, and its actual value. According to Plaintiffs' counsel, Gradison's expert witness would testify that this difference was very small, thus possibly limiting the Plaintiffs' potential recovery from Gradison.

[10]Indeed, counsel for Simons and GH&R conceded that, if the ESOP had lost in the range of $6,000,000, the settlement agreements were fair, reasonable and adequate.

- 9 -

forth the different elements which they asserted they were entitled to recover. One element was the loss of the ESOP's assets and the opportunity to grow those assets, damages that Plaintiffs contended were caused by the actions of all Defendants. In addition, the Plaintiffs contended that they were entitled to recover damages, as a result of the non-recourse loan that Star had made to the ESOP. The Opponents argued that, since the ESOP had suffered only one loss, as a result of the combined actions of all Defendants, it was improper for the Plaintiffs to attempt to recover additional damages from them (the Opponents), which they did not seek to recover from the settling Defendants.[11] If, as the Opponents asserted, the Plaintiffs are attempting to recover under an additional theory of damages from them, which the Plaintiffs have not included in their settlements with L&D, Kirkham and Gradison, it might be possible that the settlement agreements are not fair, reasonable and adequate, since those agreements could have been premised upon a less than complete consideration of all elements of the damages suffered. However, based upon the statements made

_____

[11]In their summary of damages, the Plaintiffs also contended that Enders and Star were obligated to disgorge the profits that they had made as a result of the transaction. The Plaintiffs seek to hold those Defendants liable for breach of fiduciary duty under ERISA. That statute expressly provides that a fiduciary who has breached his fiduciary duty is liable for the losses suffered by the plan, as a result, and must restore any profits he has made through the use of plan assets. 29 U.S.C. § 1109(a). Thus, the Plaintiffs assertion that Enders and Star must disgorge their profits is an additional remedy that is provided by ERISA, not applicable to L&D, Kirkham and Gradison, since they did not act as fiduciaries under that statute. Given that the settling Defendants are not statutorily obligated to disgorge their profits, the Plaintiffs are not disregarding a remedy that is available from L&D, Kirkham and Gradison and, at the same time, pursuing that remedy against the non-settling fiduciaries. Therefore, the fact that the Plaintiffs are seeking disgorgement from Enders and Star, but not from the settling Defendants, is unfair neither to the ESOP and its participants nor to Enders and Star.

- 10 -

by Plaintiffs' counsel during the fairness hearing, this Court does not accept the Opponents assertion. Plaintiffs' counsel conceded that, by seeking to recover both for the loss of the ESOP's assets (and the opportunity to grow those assets) and an additional amount of damages, based upon the non-recourse loan made to that plan by Star, they were seeking inconsistent remedies, one of which attempts to place the plan in the position it would have been if the transaction had not occurred, while the other remedy is based upon the transaction having occurred. Transcript (Doc. #246) at 71. In addition, Plaintiffs' counsel indicated that he believed that the most likely remedy against the settling Defendants would be an award of damages based upon the loss of assets by the ESOP and the opportunity to grow those assets. Id. at 72. Moreover, Plaintiffs' counsel argued extensively that disgorgement is an additional remedy which is available against Star and Enders, but not L&D, Kirkham and Gradison. However, he did not argue that there are different methods for calculating all damages, not considering the disgorgement of profits, that can be recovered from the non-settling Defendants and from the settling Defendants. Based upon those statements from Plaintiffs' counsel, the Court concludes that the Plaintiffs will rely upon the same theory of recovery (i.e., that the Plaintiffs are entitled to recover damages for the assets lost by the ESOP and the opportunity to grow those assets) against the non-settling Defendants (in addition to the disgorgement remedy discussed in footnote 11). Accordingly, based upon the estimate of the range of damages presented by Plaintiffs' counsel, to which counsel for the Opponents did not object, the Court finds that the Plaintiffs' potential recovery against the settling Defendants is in the range of $5,000,000 to $7,000,000.

- 11 -

Balancing that potential recovery against the impediments to success on the merits of the Plaintiffs' claims against the settling Defendants, which are discussed above, the Court concludes that the first Granada factor strongly favors approval of the settlement agreements. The Plaintiff are guaranteed to receive from 25% to 35% of the total loss suffered by the ESOP, as a result of settling with Defendants whose liability would have been questionable. Moreover, the Plaintiffs' claims against the non-settling Defendants remain.

The second factor identified by the Sixth Circuit in Granada is the risk associated with the expense and complexity of the lawsuit. Plaintiffs' counsel indicated that it had cost his clients $70,000, to retain the services of an expert witness who would testify that Kirkham had committed malpractice. Without settling their claims against L&D and Kirkham, the Plaintiffs would have incurred additional expenses for the services of that expert witness. In addition, the Plaintiffs claims against the remaining Defendants arise under ERISA. By settling their claims with L&D, Kirkham and Gradison, the Plaintiffs have reduced the complexity of this litigation, by limiting their lawsuit to a claim under a federal statute. Accordingly, the Court finds that this factor favors the approval of the settlement agreements.

The third factor identified by the Sixth Circuit in Granada requires the Court to consider and to weigh objections by members of the class (i.e., participants in the ESOP). No objections to either of the settlement agreements were lodged with the Court. Moreover, Frank Gollings, the current Trustee of the ESOP who is now a Plaintiff in this litigation, has indicated that he feels that the settlement agreements constitute fair, reasonable and adequate resolutions of the Plaintiffs'

claims against L&D, Kirkham and Gradison. Accordingly, this factor strongly favors the Court's approval of those two agreements.

In addition to the factors set forth in <u>Granada</u>, the Sixth Circuit has indicated that the District Court should consider the amount of discovery conducted and whether the settlement was reached as a result of arms-length negotiations (as opposed to through some form of fraud or collusion). <u>Williams</u>, 720 F.2d at 923. These considerations also strongly favor the Court's approval of the settlement agreements. The Plaintiffs did not agree to settle with L&D, Kirkham and Gradison, until after extensive discovery had been conducted. The Plaintiffs had reviewed tens of thousands of documents and had taken dozens of depositions, before settling. In addition, there is no hint that the settlement agreements are the product of anything but arms length negotiations. Indeed, those agreements were reached as a result of negotiating sessions conducted by an impartial mediator.

Finally, the Court deems it appropriate to afford some deference to the opinion of Plaintiffs' counsel that the settlement agreements are fair, reasonable and adequate.

Accordingly, based upon the foregoing, the Court finds that the settlement agreements between the Plaintiffs, on one hand, and L&D, Kirkham and Gradison, on the other, are fair, reasonable and adequate to the ESOP.


The remaining question that must be resolved, before the Court can approve those agreements, is whether the non-settling Defendants should receive a <u>pro tanto</u> or proportionate share set-off. In arguing that they are entitled to a

- 13 -

set-off based upon proportionate fault, the Opponents have placed primary reliance upon McDermott, Inc. v. AmClyde, 511 U.S. 202 (1994). That litigation was an admiralty dispute, wherein the Supreme Court was called upon to decide the method by which the liability of some defendants would be set-off, as a result of settlements entered into by other defendants. The AmClyde Court held that, when one of a group of liable defendants settles with the plaintiff, the liability of the remaining defendants is to be set-off by the proportionate share of the settling defendants' responsibility for the total obligation. The AmClyde Court rejected the use of pro tanto set-offs in admiralty cases.[12]  Since the claims against the non-settling Defendants, herein, arise under ERISA, rather than under admiralty law, this Court does not consider AmClyde to be controlling. Rather, under the circumstances of this litigation, this Court concludes that the liability of the non-settling Defendants may be reduced on a dollar-for-dollar or pro tanto basis.

In AmClyde, the Supreme Court began its analysis, by noting that no statute passed by Congress provided any "policy guidance" with respect to the question presented. Rather, the Supreme Court was free to adopt a common law rule, based upon its precedents regarding the fashioning of remedies in admiralty cases. 511 U.S. at 207. Primarily, the AmClyde Court relied upon United States v. Reliable Transfer Co., 421 U.S. 397 (1975), wherein that Court had decided to abandon a century of precedent, under which damages in admiralty cases were assessed equally among parties at fault, regardless of the degree of their relative

---

[12]The AmClyde Court actually rejected two pro tanto approaches. One of those approaches would extinguish the right of contribution of the non-settling defendants, and the other would not. The AmClyde Court rejected the latter approach out of hand, because it could discourage settlements and result in increased litigation. 511 U.S. at 211.

blame, and adopted a rule whereby damages were assessed in accordance with the relative fault of the parties. The AmClyde Court indicated that the method of set-off it would adopt had to be consistent with the principle of relative fault, set forth in Reliable Transfer. Id. at 211. In addition, the AmClyde Court noted that judicial economy and the promoting of settlements were paramount considerations. Id. Although proportionate share and the variety of pro tanto set-offs, in which the contribution rights of the non-settling defendants were extinguished, were judged to be close competitors for the appropriate method by which the liability of non-settling defendants would be set-off in admiralty cases, the Supreme Court selected the former method, because it was deemed to be more faithful to the principles of Reliable Transfer.

Herein, as indicated, the Plaintiffs seek to impose liability upon the non-settling Defendants for breach of fiduciary duty under ERISA. In contrast to the guidance provided by Congress concerning admiralty law, that statute provides significant policy guidance. Section 409(a) of ERISA provides that the fiduciary of a plan, who has breached the fiduciary duties that he owed to that plan, "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Congress did not indicate that, when a fiduciary and non-fiduciaries jointly cause a plan to suffer a loss, the fiduciary shall be liable for his proportionate share of the total liability. Rather, Congress expressly stated that the fiduciary shall "make good" the loss that results from his breach of fiduciary duty. Given the language of § 409(a), this Court, unlike the Supreme Court in AmClyde, is not governed by the principle of allocating damages according to the relative fault of the parties. Indeed, the fiduciary is responsible

- 15 -

for making good not just those damages caused by his relative fault, but all losses caused by his breach of duty. Consequently, adherence to the proportionate share principle does not drive this Court's decision. On the contrary, use of that approach could result in the principles established by Congress in § 409(a) being disregarded. Under the proportionate share approach to set-offs, the plaintiff bears the risk of settling with some defendants too cheaply. In AmClyde, the Supreme Court gave the example of two equally liable defendants (i.e., each is 50% at fault). If one settles for $250,000, and the jury finds that the plaintiff's damages are $1,000,000, the non-settling defendant, under the proportionate share method of crediting the non-settling defendant, is liable for only $500,000 (50% of the total liability). Under that scenario, the plaintiff would not be compensated for the entire loss that it suffered. Such an approach could permit a fiduciary, who has breached his duty, to avoid being required to make good the losses which the plan suffered as a result of that breach. Such a result would be contrary to the command of Congress.

In addition, the AmClyde Court deemed pro tanto set-offs, in which the non-settling defendant's right to contribution was extinguished, to be inefficient, because of the need to conduct a hearing to ascertain whether the settling defendant was paying its fair share of the total liability.[13] Herein, that concern is not present, because, as this Court has already concluded, the non-settling Defendants do not have valid claims of indemnification or contribution, under either Ohio or federal law, from any of the Defendants who have settled. See

---

[13]The AmClyde court noted that courts have required such a procedure when the non-settling defendant is losing its right of contribution.

Doc. #217 at 6-11. Consequently, since the settlement agreements will not, in and of themselves, extinguish the rights of contribution of the non-settling Defendants, there is no need to conduct such a hearing. Accordingly, there is no concern over the inefficient use of judicial time.

Finally, in In re Masters, Mates & Pilots Pension Plan, 957 F.2d 1020 (2d Cir. 1992), a case for breach of fiduciary duty under ERISA, the Second Circuit held that non-settling defendants/fiduciaries were entitled to a pro tanto set-off for the amounts paid by a number of defendants/fiduciaries who had settled.[14] The result reached therein and the reasoning employed to support that result are persuasive.

In sum, the Court concludes that, in an action arising under ERISA, where non-fiduciary/defendants have settled, the non-settling fiduciary/defendants are entitled to a pro tanto set-off for the amount that has been paid. To hold that non-settling fiduciary/defendants are liable only for their proportionate share of the total loss suffered by a plan could cause this Court to disregard the Congressional command that fiduciaries who breach their duties must make good all the losses suffered as a result.

---

[14]The Second Circuit also held that a court could not enter a bar order preventing non-settling defendants from asserting claims for contribution and/or indemnification against settling defendants, without conducting a hearing to determine whether the settling defendants were paying their fair share of the total liability. This Court has previously concluded that such a hearing was not necessary in this litigation, because the non-settling Defendants did not have rights to indemnification or contribution that could be extinguished by the settlement agreements into which the Plaintiffs, L&D, Kirkham and Gradison have entered. See Doc. #217.

- 17 -

Accordingly, based upon the foregoing, the Court approves the two settlement agreements into which the Plaintiffs have entered. As a consequence, the liability of the non-settling Defendants shall be reduced by $1,750,000, the amount paid by L&D, Kirkham and Gradison to settle the Plaintiffs' claims.[15]

The final question is whether the Court should enter final judgment, approving the two settlement agreements and, as a consequence, dismissing the Plaintiffs' claims against L&D, Kirkham and Gradison, with prejudice. Rule 54(b) of the Federal Rules of Civil Procedure provides:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In Justice v. Pendleton Place Apartments, 40 F.3d 139 (6th Cir. 1994), the Sixth Circuit restated the factors that a District Court must consider before finding that there is no just reason for delay and directing that final judgment be entered on some claims.

_____

[15]In addition, as this Court has already indicated (see Doc. #217), the non-settling Defendants do not have viable claims of indemnification or contribution against the settling Defendants.

.

> The "decision to certify a claim for immediate appeal under Rule 54(b) merits substantial deference," Solomon v. Aetna Life Ins. Co., 782 F.2d 58, 61 (6th Cir. 1986), and we review the district court's ruling for an abuse of discretion.
>
> Several factors have emerged from case law to determine whether an order is properly certifiable as a final order. See 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2659 (1983) ("Wright & Miller"); Corrosioneering, Inc. v. Thyssen Environmental Systems, Inc., 807 F.2d 1279, 1283 (6th Cir. 1986); Solomon, 782 F.2d at 61 n. 2. First is the relationship between the adjudicated and unadjudicated claims--they should generally be separate and independent so that the appellate court will not have to consider the same issues again if a second appeal is brought. Wright & Miller § 2659. Similarly, a court of appeals should not entertain appeals on issues that are still before the trial court "because questions the appellate court might want to consider have not been adjudicated at the trial level." Id. This is true both because of the need for a fully-developed record and because future proceedings in the district court might moot the issues. Another "requirement" under Rule 54(b) is that the district court articulate its reasons for certifying a final order. Solomon, 782 F.2d at 61 (failure to provide grounds for certification an abuse of discretion). The court must "weigh and examine the competing factors ... [and] do more than just recite the 54(b) formula of 'no just reason for delay.' " Id.

Id. at 141.

Herein, a application of those factors convinces this Court that it should find that there is no just reason for delay and direct the entry of final judgment on the Plaintiffs' claims against L&D, Kirkham and Gradison. The Plaintiffs have asserted state law claims against the settling Defendants, while their claims against the non-settling Defendants are based upon ERISA. However, all of those claims arise out of the same transaction, to wit: the sale of shares of Electro-Jet's stock to the ESOP; therefore, all claims share a similar factual basis. The claims against L&D, Kirkham and Gradison have been resolved as a result of settlement agreements, rather than through adjudication. Consequently, this Court has not resolved any claim on the merits, which the Sixth Circuit will be required to

review if final judgment is now entered pursuant to Rule 54(b). Therefore, there is little risk that the Sixth Circuit would be called upon to conduct a second review of the issues resolved in this Decision, even if a second appeal involving the non-settling Defendants were to be brought. If, on the other hand, this Court were to decline to make the requisite finding under Rule 54(b), and, thus, possibly delay appellate review of this Decision, until after the trial of the Plaintiffs' claims against the non-settling Defendants, a second trial of this lawsuit (with the possibility of a second round of appeals) would be required, if the Sixth Circuit were to disagree with this Decision.[16] Herein, this Court has concluded that the Defendants are entitled to have their liability reduced on a pro tanto basis, rather than by the proportionate share method. If the Sixth Circuit should disagree with that conclusion, a second trial of Plaintiffs' claims against the non-settling Defendants would be required to determine the proportionate fault of the non-settling Defendants. On the other hand, allowing the issue of the appropriate manner of reducing the liability of the non-settling Defendants to be tested on appeal now, delaying the trial until the appeal is resolved, will obviate the need for two trials, even if the Sixth Circuit should disagree with this Court's resolution of that issue. In addition, the Court has approved settlements which contain bar orders, preventing the non-settling Defendants from asserting claims for contribution or indemnification against the settling Defendants. Allowing the approval of such bar orders to be tested on appeal, before a trial has been

---

[16]In Justice, the Sixth Circuit also indicated that an appellate court should not entertain appeals on issues that are still before the trial court. 40 F.3d at 141. Herein, this Court is directing that final judgment be entered on its Decision to approve the two settlements. Since that Decision has been made with finality, the Sixth Circuit will not asked to review issues that remain before this Court.

- 20 -

conducted in this litigation, will avoid the possibility that two trials will be required. The settling Defendants have conditioned the settlements on such bar orders. Accordingly, a trial of the Plaintiffs' claims against the settling Defendants could be required, if the Sixth Circuit should conclude that the bar orders are inappropriate. An appeal now, with the concomitant delay of trial between the Plaintiffs and the non-settling Defendants, will allow the Plaintiffs' claims against all Defendants to be resolved in one trial, if this Court's approval of the bar orders were to be reversed. Consequently, the more efficient course, both in the trial and appellate courts, is for this Court to find that there is no just reason for delay and to direct the entry of final judgment on the Plaintiffs' claims against L&D, Kirkham and Gradison, pursuant to Rule 54(b).

Accordingly, the Court expressly finds that there is no just reason for delay and, consequently, directs that final judgment be entered, approving the settlement agreements and dismissing the Plaintiffs' claims against L&D, Kirkham and Gradison, with prejudice. An integral part of the approval of those agreements is the Court's conclusion herein that the liability of the non-settling Defendants shall be reduced, on a pro tanto basis, by $1,750,000, the amount paid by L&D, Kirkham and Gradison to settle the Plaintiffs' claims. In addition, the approval of the settlement agreements, which contain bar orders, will preclude the assertion of claims for indemnification and/or contribution against the settling Defendants.[17]

---

[17]Whether the bar orders constitute injunctions that are appealable (see 28 U.S.C. § 1292(a)), independent of the final judgment entered herein, is a question which this Court need not resolve. The same comment is equally applicable to the question of whether this Decision is appealable under the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949).

Pursuant to Rule 62 of the Federal Rules of Civil Procedure, to allow both for an orderly appeal and, if reversed on appeal, to allow the Court to retain jurisdiction over the settlement funds, now on deposit in an interest bearing account, the Court will stay the distribution of the funds from the settlement agreements.[18]

Alternatively, this Court certifies this Decision for an immediate appeal pursuant to 28 U.S.C. § 1292(b), which provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

(emphasis in the original).  Herein, the decision of this Court to approve the settlement agreements involved the resolution of a controlling question of law, to wit: whether a pro tanto or proportionate fault set-off should be adopted.  There being no controlling precedent from either the Sixth Circuit or the Supreme Court, there is a substantial ground for a difference of opinion on that issue.  In addition, for reasons set forth above (i.e., avoiding the risk that two trials would be

---

[18]During a telephone conference call between the Court and counsel, conducted on May 18, 1999, procedures by which those settlement funds may be invested in different interest-bearing accounts were established.  The Court discusses those procedures below.  The fact that these funds are now deposited in an interest bearing account outweighs the need, in this Court's opinion, for a supersedeas bond.

required in this litigation), resolution of the propriety of the approval of the settlement agreements will materially advance the ultimate termination of this litigation. Accordingly, this Court certifies this Decision for an immediate appeal, pursuant to 28 U.S.C. § 1292(b).

On May 18, 1999, the Court and counsel conducted a telephone conference call. The Court now journalizes the procedures established during that conference call.

First, the Court informed counsel that it would be filing this Decision, approving the settlement agreements. In response, counsel for the non-settling Defendants, in particular Star's counsel, argued persuasively that the Court should delay the trial of this litigation, until they have had the opportunity to obtain appellate review of the Court's conclusion that those agreements should be approved. Accordingly, the Court vacated the previously established trial date and indicated that, pursuant to Rule 54(b), it would enter final judgment on Plaintiffs' claims against L&D, Kirkham and Gradison.

Second, counsel informed the Court that a mediation session was scheduled by the Sixth Circuit for June 2, 1999.[19] The Court directed all parties to participate in that mediation. Although all counsel indicated that they would willingly participate, counsel for L&D and Kirkham stressed that he did not want his participation to be construed by the mediator or any of the parties as an

---

[19]That mediation, which arises out of a notice of appeal previously filed by Star, will address all aspects of this litigation, rather than merely the issues which Star has appealed.

- 23 -

indication that his clients would contribute more to the settlement of this litigation than the previously agreed upon amount.

Third, the parties agreed to inform the Court as to the results of the mediation. If that process does not result in the resolution of this litigation, the Court will schedule a telephone conference call in order to establish further procedures leading to the resolution of this litigation, including, perhaps, some type of advisory opinion concerning the Plaintiffs' damages.[20]

Fourth, the Court and counsel discussed Star's request that distribution of the settlement funds be stayed. As indicated above, the Court has stayed that distribution. During that discussion, Plaintiffs' counsel raised the issue of the manner in which those funds have been invested since the settlement agreements were executed. Plaintiffs' counsel expressed the fear that those funds have been earning a low rate of interest in the intervening period. The Court directed Plaintiffs' counsel to inform the Court of the specific location of those funds.[21] If Plaintiffs' counsel deems it preferable to invest those funds in a different manner (i.e, in the equity markets, rather than in a money market account), he must provide information concerning that alternative to the Court and to counsel for the

---

[20]The Court established an executive committee, which will participate in any future telephone conference calls, which is composed of the following members, to wit: Stephen Perry, for the Plaintiffs; Thomas Schuck, for Star; John Hust, for Enders and Richter; Robert Pitcairn, for Weber and Gerding; Clem DeMichelis, for L&D and Kirkham; James Burke, for Gradison; David Greer, for GH&R and Simons; and Eric Holzapfel, for Electro-Jet.

[21]Plaintiffs' counsel indicated that those funds were in escrow accounts. Counsel for L&D and Kirkham indicated that the settlement funds paid by his clients had been deposited in an interest-bearing account with Provident Bank.

other parties.  The other parties may thereafter present their objections, regarding the Plaintiffs' suggestion, to the Court.


June 2, 1999

                            WALTER HERBERT RICE, CHIEF JUDGE
                            UNITED STATES DISTRICT COURT


Copies to:

All counsel of record

- 25 -